UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

THOMAS JOSEPH ZIMMER, V
and THOMAS JOSEPH ZIMMER, VI,
a minor by and through his mother and
next best friend, VALERIE L. CONNELL,

      Plaintiffs,

v.                             Case No. l:04cv29SPM/AK

PRISON HEALTH SERVICES, INC.

      Defendants.

_____/

**DEFENDANT, PRISON HEALTH SERVICES, INC.'S,
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**I.  STANDARD OF REVIEW**

      Summary judgment should be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  The Supreme Court has explained the summary judgment standard:

          [T]he plain language of Rule 56 (c) mandates that entry of summary
          judgment, after adequate time for discovery and upon motion,
          against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  Celotex Corp v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Celotex, 477 U.S. at 323.  Once the initial demonstration under Rule 56 (c) is made, the burden of production, not persuasion, shifts to the non-moving party.  The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'"  Id. At 324; see also Fed. R. Civ. P. 56 (e).

That party must demonstrate that there is a "genuine issue for trial".  Fed. R. Civ. P. 56 (c); Matsushita Elec. Indus. Corp. v. Zenith, 475 U.S. 574, 587 (1986).  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find the non-moving party."  Id.

## II. BACKGROUND

Plaintiffs, Thomas Joseph Zimmer, V (hereinafter referred to as "Mr. Zimmer"), et al, allege that PHS, by and through its employees, breached its duty of care to provide timely and appropriate medical treatment to Mr. Zimmer in accordance with accepted

professional standards. This breach allegedly occurred during Mr. Zimmer's voluntary commitment at the Alachua County Detention Center beginning on May 28, 2001.

Plaintiffs' only causation expert, Dr. Benjamin G. Newman, a family practitioner as opposed to a neurologist or neurosurgeon, will attempt to testify about the correlation between the alleged delay in medical care and Mr. Zimmer's ultimate neurological outcome.[1]   Dr. Newman's deposition was taken on December 1, 2003 in Norfolk, Virginia. Subsequent thereto, this case was removed to Federal Court.

This Honorable Court entered an initial Scheduling Order on March 24, 2004. (Doc.20).   Pursuant to the initial Scheduling Order, Rule 26(a)(2) disclosures of Plaintiffs' expert witnesses and their opinions were to be made by Plaintiffs' counsel within 60 days from the date of the Scheduling Order, or by May 23, 2004. (Doc.20). In violation of this Court's Order governing the timely disclosure of expert reports, Plaintiffs' served its disclosure of Dr. Newman and his report on June 3, 2004, approximately one month late and after Defendant PHS had served its expert disclosures. Dr. Newman was the only medical expert disclosed by Plaintiffs pursuant to Rule 26(a)(2) who will address the causation issue.   (See Plaintiff's Disclosure of Experts – Dr. Benjamin Newman, attached hereto as Exhibit "2")

---

[1] Plaintiffs' have disclosed Steven A. Reid, M.D. one of Mr. Zimmer's treating physicians as a potential witness.  It is indicated pursuant to Plaintiffs' Witness List that Dr. Reid will testify regarding Mr. Zimmer's condition, future prognosis, standard of care administered to Mr. Zimmer by Dr. Baker and the medical staff, any acts and omissions of Prison Health Services and Dr. Baker. (See Plaintiffs' Witness List attached hereto as Exhibit "1") Appropriate motions will be forthcoming wherein it will be argued that Dr. Reid should be precluded from giving any expert opinions, including opinions pertaining to standard of care and causation, since he was never disclosed or listed as an expert witness.

Dr. Newman's report served pursuant to Rule 26 contains several statements wherein it is indicated that Mr. Zimmer's damages could have been prevented but for the delay in his treatment.  (Ex. "2", Newman report, pp. 1-2)  Dr. Newman also referenced causation several times during his deposition of December 1, 2003.   The specific deposition testimony will be referenced subsequent hereto.

This Memorandum will demonstrate that Dr. Newman's opinions regarding causation are not based on reasoning or methodology that is scientifically valid. Therefore, these opinions are not admissible under Rule 702. In addition, any probative value of these opinions is substantially outweighed by the risk of unfair prejudice to PHS, and they are therefore inadmissible. Fed.R.Evid. 403.  Accordingly, Plaintiffs should not be permitted to proffer the opinions of Benjamin Newman, M.D. at trial.

### III. <u>DAUBERT ANALYSIS</u>

As established by the Supreme Court in <u>Daubert v. Merrell Dow Pharms , Inc</u> , 509 U.S. 579 (1993), a trial court acts as a "gatekeeper" to the admission of expert scientific testimony under Rule 702. The court must conduct a preliminary assessment to, " . . . ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." <u>Id.</u> at 589. This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the "reliability" prong); and (2) whether that reasoning or methodology properly can be applied to the facts in issue (the "relevancy" prong) <u>Id.</u> at 592-93;  <u>Kennedy v.Collagen Corp.</u>, 161 F.3d 1226, 1228 (9th Cir. 1998).

Reliable testimony must reflect "scientific knowledge" —  implying a " . . .

grounding in the methods and procedures of science" and signifying something beyond

" . . . subjective belief or unsupported speculation." <u>Daubert</u>, 509 U.S. at 590. The inferences or assertions drawn by the expert must be " . . . derived by the scientific method." <u>Id.</u> In essence, the trial court must determine whether the expert's work product amounts to " . . . good science." <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 43 F.3d 1311, 1315 (9th Cir. 1995) ("<u>Daubert II</u>") (quoting <u>Daubert I</u>, 509 U.S. at 593) The relevancy, or "fit," prong requires that the testimony be " . . . relevant to the task at hand, . . . i.e., that **it** logically advances a material aspect of the proposing party's case." <u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at 597)

In <u>Daubert</u>, the Supreme Court outlined the factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. 509 U.S. at 593-94. The Court emphasized the "flexible" nature of this inquiry. <u>Id.</u> at 594.

As later confirmed in <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137,141-42 (1999): *"Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." <u>Accord, Daubert II</u>, 43 F.3d at 1317.

The <u>Daubert</u> analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions. 509 U.S. at 595. However, the

Supreme Court later cautioned that, "conclusions and methodology are not entirely distinct from one another." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). As such, "[A] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id. (finding nothing in either Daubert or the Federal Rules of Evidence requiring the admission of opinion evidence connected to existing data, " . . . only by the *ipse dixit* of the expert.")

Upon remand of Daubert, the Ninth Circuit added that expert testimony " . . . based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions expressed were 'derived by the scientific method.'" Daubert II, 43 F.3d at 1317. Where not based on independent research, the testimony must be supported by objective, verifiable evidence that it rests on scientifically valid principles, such as peer review and publication in a reputable scientific journal.  Id. 1317-18. In the absence of independent research or peer review, experts must explain the process by which they reached their conclusions, and identify some type of objective source demonstrating their adherence to the scientific method. Id. at 1318-19; Domingo v. T.K., 289 F.3d 600, 605-06 (9th Cir. 2002).

### A. PROPOSED EXPERT TESTIMONY OF DR. NEWMAN

Plaintiffs have selected and proffered Dr. Newman as an expert witness. Dr. Newman's testimony is to be offered for the purpose of establishing deviations from the accepted standard of care by PHS personnel, as well as proving causation.  With regard to the causation issue, Dr. Newman's testimony is to be offered as proof that the alleged delay in treatment caused by PHS personnel resulted in neurological deficits, which Mr.

Zimmer would not have suffered had he received treatment earlier.

## B. QUALIFICATIONS OF DR. NEWMAN

Dr. Newman is a family practitioner.  He is not a neurologist or neurosurgeon.  He is currently employed by the Department of Defense as a Fleet Surgeon for the Second Fleet/Striking Fleet Atlantic in Norfolk, Virginia. (See, Curriculum Vitae attached to Ex. "2"). Dr. Newman has held this position from 2003 to present.  It should be noted that although his title is Second Fleet Surgeon, he is not a surgeon. (12/1/03 deposition of Dr. Newman, p. 20).  This is only a job title, albeit a mischaracterization.

From 1969 through 1998, Dr. Newman practiced as a family physician in Philadelphia, Pennsylvania and Altamonte Springs, Florida. (see Curriculum Vitae attached to Ex. "2").  Dr. Newman was recalled to active duty in 1991. Other than working as a family physician in Norfolk, Virginia from 2002 through 2003, Dr. Newman has been employed by the Armed Forces since 1991. (See Curriculum Vitae attached to Ex. "2").

Dr. Newman's board certifications are in family practice. ( See Curriculum Vitae attached to Ex. "2"). He holds no board certifications in neurology or neurosurgery. Additionally, Dr. Newman has not authored any publications pertaining to neurology.  As a matter of fact, he has not authored any peer-reviewed articles in the past ten years. (See Curriculum Vitae attached to Ex. "2").

Dr. Newman also does not have any particular specialty in hematomas or treating blood conditions. (Depo. of Dr. Newman, p. 22). He is interested in bleeding disorders, but has no additional expertise other than as a family doctor. (Depo. of Dr. Newman, p.

22).

## C. INFORMATION CONSIDERED BY DR. NEWMAN

The only information considered by Dr. Newman in forming his opinions is as follows: Alachua General Hospital Medical Records on Mr. Zimmer of May 28, 2001; Prison Health Services medical records; Prison Health Services nursing notes; Department of the Jail Log; EMS Transport documentation; Prison Health Services Policies and Procedure manuals; Alachua General Hospital and Surgical Records; Shands at Vista Records; Dr. Steven Reid's medical records and testimony; Jail Policy and Procedure records; Health Services Agreement; protocol from Marchman Act;  and deposition of Dr. Larry Baker. (See Exhibit "2", p. 2).

With regard to these records, Dr. Newman testified that eight of the groups of documents were not relevant in forming his opinions.  (Depo. of Dr. Newman, p. 70). He also did not do any independent research or medical reviews to form his opinions.  (Depo of Dr. Newman, p. 15). He admitted that he did not consider any peer review articles, studies, research, or the like.  He has never performed a physical examination of or spoke with Mr. Zimmer.  (Depo of Dr. Newman, p.15).

Accordingly, it appears that Dr. Newman's opinions are solely based upon his review of the Alachua General Hospital Medical Records of May 28, 2001, Prison Health Services medical records and nursing notes, Dr. Steven Reid's medical records, and the deposition testimony of Dr. Larry Baker.

## D. DR. NEWMAN'S OPINIONS RELATIVE TO
## THE NEUROLOGICAL OUTCOME OF MR. ZIMMER

Dr. Newman rendered opinions relative to causation in his Rule 26 Expert report.

(Ex. "2", Newman report, pp. 1-2).  Additionally, throughout his deposition Dr. Newman stated that the delay in treatment by PHS personnel resulted in permanent damage to Mr. Zimmer. Specific testimony by Dr. Newman was as follows:

> "But again, from memory, about nine hours later or so he finally does go to the hospital where, instantaneously, the right diagnosis was made and the proper treatment was rendered.
>
> The delay in that treatment, without a question of a doubt, in my mind has resulted in permanent damage to this man. If he was first evaluated for the discomfort in his arm, even if they thought it was dislocation, they would find out that it wasn't. But if they knew it was a bleed and they immediately evacuated the blood from his intracranial space, this man most likely would have no permanent damage at all."(Emphasis added) (Deposition of Dr. Newman, pg.26)

Dr. Newman also stated on pages 53 – 55 of his deposition:

Q:   Do you have any opinion as to whether, in fact, there was a delay between the time when Dr. Baker saw Mr. Zimmer and the time Mr. Zimmer arrived in the emergency room, whether that delay in any way caused damage to Mr. Zimmer?[2]

A:   Oh, absolutely. I mean, every minute the clock is ticking there is increasing morbidity here. Absolutely. You know, we talk about the golden hour in trauma. We talk – now we talk about that and neurological insults. Someone who has a neurological insult, neurological symptoms suggestive of a stroke, should go to the emergency room for treatment as soon as possible. And after a few hours, the prognosis is tremendously altered to the worse. This is a true emergency.

Q:   What damages do you believe Mr. Zimmer sustained that he would not have, had he gone to the emergency room that morning right away?

A:   I think it's quite possible that he would have had no neurological sequellae. He would not be having weakness or paralysis of his extremities if this were treated vigorously.

Q:   Is that an opinion that you would defer to a neurologist in terms of a specific causation opinion regarding any delay?

---

[2] Dr. Baker saw Mr. Zimmer on May 31, 2001 at 6:45 a.m. (See Depo of Newman, p. 99)

A:    <u>Certainly a neurologist or a neurosurgeon would be more qualified to render that opinion</u>, but this is well within the perview of a family doctor, who handles this all the time and sees patients who have very similar symptoms and, for whatever reasons, they don't go to the hospital, and what happens to them versus those who do recognize the symptoms and do go to the hospital and get emergent treatment, so I think, yes, <u>absolutely a neurologist or neurosurgeon would be certainly more qualified then me</u>, but any physician who has been in practice for a while has seen lots of this, because strokes are a very common illness, and has seen the difference between early intervention and delayed intervention, because early intervention is kind of the new philosophy, quite frankly. Probably the past five, six, seven years we have realized that early is better than late. When I first started practice, we would have someone with symptoms of a stroke and let them complete the stroke and then send them to rehab. That was the treatment. (Emphasis added) (Depo Dr. Newman, pp. 53-55).

## E. <u>DR. NEWMAN'S CONTRADICTORY OPINIONS RELATIVE TO THE NEUROLOGICAL OUTCOME OF MR. ZIMMER</u>

Dr. Newman also rendered contradictory opinions regarding the delay in treatment. He was asked as follows:

Q:    And let's assume that Mr. Zimmer, upon the first complaint at 4:00 p.m. on May 29th, when he complained about not being able to move well and his shoulder was hurting, that he was immediately taken to the hospital and they performed a CAT scan on him and noticed a bleed and they performed immediate surgery. What you are telling me today is his outcome could have been exactly the same as it was, even if it had been diagnosed earlier?

A:    You know what I am telling you? <u>I am telling you we don't know</u>, and why should we inflict that penalty on somebody when we don't know, when we could know if we transport him to the hospital.

Q:    If you will allow me to put it in legal terms, because we have to do that, being lawyers, are you able to state within a medical degree of probability that earlier intervention in this case -- in other words, sending the patient out at 4:00 p.m. on May 29th would have made any difference in his outcome?

A:    Yes I am.

Q:    Okay. Why are you able to state that?

A:    Because we know that the sooner any intervention, in terms of diagnostics,

his outcome has to be better. It certainly wouldn't be worse. It wouldn't be worse if we hustled and got him to the hospital. <u>So if it is not worse, it has to be better.</u> It would not be the same. This is not a situation where you wait and see, without knowing what the patient has. (Emphasis added) (Depo of Dr. Newman, pp. 96-97).

Dr. Newman was again asked whether he can pinpoint a time when surgery, if performed to evacuate the brain bleed, would have completely cured Mr. Zimmer of any neurological sequellae. This dialogue went as follows:

Q:    Is there one point in time, Dr. Newman, where you can state that surgery, had it been done, to evacuate the brain bleed on the plaintiff would have completely cured him of any neurological sequellae?  Can you point to one specific –

A:    I want to help you. I want to do the right thing, and I really want to help you, and I don't want to do the legalease thing here.  <u>Just let me say I am not a neurologist, I am not a neurosurgeon, so I am not even sure I am qualified to answer that question</u>, number one, but what I am qualified to answer, and I think is germane, is when should he have been transported to the hospital. <u>What happens after that, I am not a surgeon, so I should not answer that question, because it would just be a guess.</u>

Q:    Fair enough.

<u>The testimony, then, that you expect to give at trial has to do with the need to get this patient to the emergency department as soon as possible so that he may be evaluated and they can decide when to do surgery?</u>

A:    Right. Let the experts take care of it.

Q:    <u>And whether or not earlier surgery would have made a difference or not, your going to defer to the neurosurgeon or the neurologist on that issue?</u> (Emphasis added)

A:    Yes sir. (Depo of Dr. Newman, pp. 98-99). (emphasis applied)

### III.  <u>APPLICATION OF DAUBERT TO INSTANT CASE</u>

### A. <u>RELIABILITY PRONG OF DAUBERT</u>

### 1. <u>DR. NEWMAN'S OPINIONS ARE NOT BASED ON TESTED THEORIES</u>

One key question to be answered in determining whether an expert's theory is within accepted scientific knowledge is whether it has been tested. Daubert, 509 U.S. at 593. In cases where Plaintiff proffers proof of causation of injury through expert testimony, the expert must explain the level of exposure to harm plaintiff encountered as a result of Defendant's actions. Cartwright v. Home Depot USA, Inc., 936 F.Supp. 900, 903 (M.D. Fla. 1996)(expert's conclusions not supported with knowledge of level of exposure, therefore, not scientific). See generally, Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1163-1164 (S.D.Fla.1996)(expert's opinions not scientific with respect to proffered testimony that sleeping medication caused psychiatric and behavioral effects experienced by plaintiff); Chikovsky v. Orthopharmaceuticals Corp., 832 F.Supp. 341, 345(S.D.Fla.1993) (expert opinions were not scientific on issue that acne medication applied to pregnant woman caused birth defects).

In each of these decisions, the Courts found that plaintiff's expert failed to establish that their theories were testable, which in part resulted in holdings that their causation opinions were not admissible. Dr. Newman's causation opinions suffer from the same type of failures.

Again, Dr. Newman is not a neurologist or neurosurgeon. (Depo of Dr. Newman, p. 98). Despite this fact, Dr. Newman has rendered an opinion that PHS's delay in treatment resulted in permanent damage to Mr. Zimmer. (Depo of Dr. Newman, p. 26). He has opined that had Mr. Zimmer been taken to an emergency room on May 31, 2001 at 6:45 a.m., it is possible that he would have had no neurological injury as a result of this bleed. (Depo of Dr. Newman, p. 53-54). (See also, Depo of Dr. Newman, p. 99).

Dr. Newman's bald opinions in this regard are not based on any tested theory. Dr. Newman also did not rely on any scientific data in reaching these conclusions. When asked the basis of his opinion, the deposition dialogue went as follows:

Q:   I will try to ask it of you again.  We were talking about the fact that some patients who do have a intracranial bleed have that bleed and even if you perform surgery immediately, there is nothing that you could do to decrease the outcome or make the outcome better.   And you have agreed with that statement?

A:   I agree, yes.

Q:   Okay.  But you do not agree that that was the case here?

A:   That's right.

Q:   And my question was, why is that?

A:   Because -- because we don't know, that's the reason and we need to know. (Emphasis added) (Depo of Dr. Newman, p. 95)
         . . . . . . . . . . . . .
Q:   And let's assume that Mr. Zimmer, upon the first complaint at 4:00 p.m. on May 29th, when he complained about not being able to move well and his shoulder was hurting, that he was immediately taken to the hospital and they performed a CAT scan on him and noticed a bleed and they performed immediate surgery. What you are telling me today is his outcome could have been exactly the same as it was, even if it had been diagnosed earlier?

A:   You know what I am telling you? I am telling you we don't know, and why should we inflict that penalty on somebody when we don't know, when we could know if we transport him to the hospital.

Q:   If you will allow me to put it in legal terms, because we have to do that, being lawyers, are you able to state within a medical degree of probability that earlier intervention in this case -- in other words, sending the patient out at 4:00 p.m. on May 29th would have made any difference in his outcome?

A:   Yes I am.

Q:   Okay. Why are you able to state that?

A:   Because we know that the sooner any intervention, in terms of diagnostics,

his outcome has to be better. It certainly wouldn't be worse. It wouldn't be worse if we hustled and got him to the hospital. <u>So, if it is not worse, it has to be better.</u> It would not be the same. This is not a situation where you wait and see, without knowing what the patient has. (Emphasis added) (Depo of Dr. Newman, pp. 96-97).

Thus Dr. Newman candidly admitted that we do not know if Mr. Zimmer's outcome, had he had immediate surgery at the time of the bleed, would have been any different.  Clearly, Dr. Newman's testimony that if Mr. Zimmer's outcome is not worse, it has to be better, is not based on a tested theory.  This vague basis for Dr. Newman's opinions do not make them scientifically valid.

As the <u>Daubert</u> Court instructed, " . . . knowledge' connotes more than a subjective belief or unsupported speculation." <u>Daubert</u>, 113 S.Ct. at 2795.   Dr. Newman's opinions are just that, unsupported speculation, because in Dr. Newman's own words, "We don't know what would have occurred".   This is precisely the kind of evidence that the trial judge must exclude, in performing the gatekeeper function.

## 2. THE ERROR RATE OF THE SCIENTIFIC THEORY UNDERLYING DR. NEWMAN'S OPINIONS IS UNKNOWN

Where an expert relies on a scientific technique, the Court should consider the known or potential rate of error associated with the technique. <u>Daubert</u>, 509 U.S. at 594. However, where the expert's theories are vague and untested, the court cannot ascertain the rate of error and this consideration becomes inapplicable. <u>Cartwright</u>, 936 F.Supp. at 905.  Such is the case at bar.  Dr. Newman admittedly did not perform any tests of causation to support his theory in the instant case.

## 3. DR. NEWMAN'S OPINIONS HAVE NOT BEEN SUBJECTED TO PEER REVIEW

Another consideration in determining whether an expert's opinions are based on scientific knowledge is whether the opinion has been subjected to peer review and publication. Daubert, 509 U.S. at 593. Where publications exist, but are dissimilar to the facts presented in the litigation, the court may reject the expert's reliance upon them. General Electric Co. v. Joiner U.S., 118 S.Ct. 512, 518; 139 L.Ed. 2d 508 (1997); Washington v. Vogel, 880 F.Supp. 1545, 1547 (M.D. Fla. 1995) (Expert failed to justify application of a study where he did not independently verify that the study was applicable to the facts at issue); See also, Cartwright, 936 F.Supp. at 905 (Even when literature exists that the exposure can cause the pathology, expert must still produce logical steps showing that the literature supports his ultimate conclusion). In the instant case, Dr. Newman did not rely on any peer-reviewed materials to support his ultimate conclusions. (Depo of Dr. Newman, pp 13-15; Ex. "2", p. 2)

Dr. Newman testified that with regard to the delay in treatment, every minute the clock was ticking there was increasing morbidity. (Depo of Dr. Newman, p. 53). He referenced the "golden hour in trauma". (Depo of Dr. Newman, p. 53). He noted that after a few hours, the prognosis was altered to the worse. (Depo of Dr. Newman, p. 54). But he acknowledged that a neurologist or neurosurgeon would be more qualified than him to give a specific causation opinion regarding any delay. (Depo of Dr. Newman, p. 54). However, he stated that any physicians who have seen a lot of stroke victims would indicate that early intervention is the new philosophy. (Depo of Dr. Newman, p. 55).

In complete contradiction of this family practitioner's testimony, Defendant's expert board certified neurosurgeon, Dr. Thomas B. Flynn, testified that early

intervention would <u>not</u> have effected Mr. Zimmer's ultimate neurological outcome.  This deposition dialogue with Dr. Flynn was as follows:

> Q:   Right.  If there was early intervention when the brain bleed was still very small, would that change his outcome?
>
> A:   I have already given that opinion.  And the answer is in my opinion, no.
>
> Q:   If the damage to the brain is caused by an expanding blood clot destroying the brain tissue, why is it that if that was addressed when it was very small you would not expect a better outcome?
>
> A:   Well -- and I know you think I'm crazy with my opinion here and I know it sounds illogical-- but if you look at the outcomes, considering the practicalities of how one intervenes and the complication rate following intervention, in patients with a brain bleed, it makes no difference along the continuum of expansion of that lesion, when, if one decides to intervene, of the patient's ultimate outcome, because of the mechanics of evacuating the bleed and because of the high recurrence rate which is even much worse in a patient with a blood dysplasia such as Mr. Zimmer.
>
> And this is a -- it is something neurosurgeons are faced with all the time.  That is the decision about whether to do this or not.  If there were some minimally invasive way or other method to address these hematomas and to insure that they would not rebleed -- which is almost ubiquitous-- then perhaps intervention  would make a difference.
>
> But in this day and age, I can firmly state that neurosurgical intervention of the type that is available to us now technically does not influence the outcome of these lesions, whether you get them early or late.
>
> Q:   Am I understanding you to say that the surgery itself causes some of the deficits?
>
> A:   It is that it-- the surgery itself at the very least, does not improve the deficits and may well cause further damage because of the destructive nature of the surgery itself.   You have to go through the brain to get to the clot. (February 13, 2004 depo of Dr. Thomas B. Flynn, pp. 77 – 79)
> . . . . . . . . . . . . .
> Q:   Would his brain, Mr. Zimmer's brain, have continued to swell if there had not been intervention, surgical intervention.
>
> A:   Yes.

Q:    Would that continued brain swelling cause permanent deficits.

A:    Beyond that which he had. Not likely.

Q:    Why not?

A:    This lesion had already decompressed itself into the ventriqulus.  The most likely subsequent issue to develop in a patient like this is hydrocephalus, which is treatable by means other than surgical intervention…  (Depo of Dr. Flynn, pp. 80)

. . . . . . . . . . . . . .

Q:    Is it more likely than not if Mr. Zimmer would have -- that Mr. Zimmer would have had a better outcome if he had gotten to the hospital sooner?

A:    Here we go again.

Q:    I know, I apologize.

A:    The answer is the same.  I do not believe so, no, sir.

Q:    And, again, is it more likely than not that early detection of the brain bleed would have reduced his permanent deficits?

A:    I do not -- it is my opinion that it would not.  (Depo of Dr. Flynn, pp. 87 - 88)

. . . . . . . . . . . . . .

Q:    Okay I think you have said all the way through that you don't view this as an emergency situation.

A:    Yes.  And, again, it defies lay logic why I would say that.  I don't view it as an emergency situation because of the diagnosis having been established, and my opinions being voiced, the outcome is not influenced by the -- rapidity with which the problem is or is not addressed.  (Depo of Dr. Flynn, pp. 90 - 91)

Dr. Flynn also discussed why additional brain swelling would not have affected Mr. Zimmer's ultimate permanent deficits as follows:

Q:    Well, let me ask it a different way.

17

Would you agree when you were dealing with an expanding blood clot in the brain that the patient's best chance for a good outcome are to treat the patient as early as the problem is identified?

A:   I would disagree with that.

Q:   Okay.  Why?

A:   There is no evidence in the neurosurgical literature at all that I am aware of that surgical intervention on either traumatic intercerebral or spontaneous intercerebral bleeds results in the diminishing of the morbidity or mortality - - that is, the outcome -- of patients with these lesions. (Depo of Dr. Flynn, pp. 16)

It is clear that Dr. Newman's contrary opinions pertaining to Mr. Zimmer's neurological outcome, based upon his experience as a family practitioner, are not generally accepted in the scientifically-hyperspecialized area of neurosurgery.   Dr. Newman's opinions are instead pure speculation presented in the guise of legitimate scientifically-based expert opinion.

## B. RELEVANCY PRONG OF DAUBERT

The second prong of Daubert involves determining whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand and determine a fact in issue. Daubert, 509 U.S. at 592.  This Honorable Court does not even need to address whether Dr. Newman's opinions would be helpful to the trier of fact, since his bald opinions should be excluded under the first prong of the Daubert test.  See Chikovsky, 832 F.Supp. at 346.  However, if the Court reviews the entirety of Dr. Newman's reports and deposition testimony, it is clear that these fail to identify what "methodology" Dr. Newman employed, other than reliance on the sequence of events in issue.

It is well settled that an expert causation opinion based solely on a temporal relationship is not derived from the scientific method, and is therefore insufficient to

satisfy the requirements of Rule 702.  See, e.g. Porter v. Whitehall Laboratories, Inc., 9 F.3d 607, 611 (7th Cir. 1993) (Expert testimony of two doctors excluded where their opinions were based solely on the temporal relationship between the ingestion of ibuprofen and injury.); Conde v. Velsicol Chemical Corp., 804 F.Supp. 972, 1023 (S.D. Ohio 1992) aff'd 24 F.3d 809 (6th Cir. 1994).  The Court in Cavallo v. Star Enterprise, 892 F.Supp. 756, 761 (E.D. Virginia 1995) observed:

> Of course, scientists, like all human beings hold certain opinions based on no more than intuition or belief.  Because such opinions are not subject to rigorous scientific validation (through testing, peer review, and the like) they are mere hypotheses that fall short of the evidentiary requirements of Rule 702.  Were such untested opinions and beliefs admissible, then, contrary to Daubert, scientists would be speaking in court without the benefit of science.

Based on the foregoing, Defendant PRISON HEALTH SERVICES, INC. respectfully moves this Honorable Court to exclude Dr. Newman's opinion testimony.  Dr. Newman's causation opinions are not based on scientifically valid principles, and therefore do not meet the reliability requirements of Rule 702 as interpreted by the Supreme Court in Daubert, supra.

## V. TESTIMONY OF DR. STEVEN ALLEN REID

### A. BACKGROUND

This Honorable Court's initial scheduling order required Plaintiffs' expert witnesses and their opinions to be disclosed by May 23, 2004. (Doc. 20).  Plaintiffs served their Rule 26 expert disclosures on June 24, 2004.  No disclosure or report was served with regard to Dr. Reid.

On Plaintiffs' witness list of June 4, 2004, Dr. Reid is listed as a potential witness. It is noted that he will testify regarding Mr. Zimmer's <u>condition, future prognosis, underlying standard of care administered to Mr. Zimmer by Dr. Baker and the medical staff, any acts and omissions of PHS and Dr. Baker.</u> (Emphasis added) (See Ex. "1").

There is no indication in reviewing Plaintiffs' witness list that Dr. Reid will testify regarding causation in the case.   (See Ex. "1").   Additionally, Dr. Reid should be precluded from giving any expert opinions regarding standard of care administered to Mr. Zimmer by Dr. Baker and the medical staff and any acts and omissions of PHS and Dr. Baker.  Plaintiffs have failed to comply with the Rule 26 disclosures.

It appears that Dr. Reid himself is unclear whether he is an expert in the case. Deposition testimony reflective of this is as follows:

> Q:    Have your charged Mr. Rush any charges for the time he spent with you?
>
> A:    I don't believe so.   You can check with my office manager on that question, but I don't believe so.
>
> Q:    Why not?
>
> A:    Because I personally feel that Mr. Zimmer experienced a great injustice at the hands of the State and I feel that if I can do something to help expose this, that I would be doing something good. (January 16, 2004 depo of Dr. Reid, pp. 10 - 11).
> . . . . . . . . . .
> Q:    Or how about any opinions that you plan to express today?
>
> A:    Well, I'm really not planning to express opinions unless I am asked.
>
> Q:    Well, you've told me before that you wanted to help Mr. Zimmer because you felt as though there has been a great injustice to him; correct?
>
> A:    Yes.

Q:     Having said that now, doctor, in all candor, isn't it fair that you know you are going to express some opinions today?

A:     Well, like I say, I don't know what I'm going to express until I'm asked, but at this point if you want to ask me what my opinion is about Mr. Zimmer's course, I will discuss that. (Depo of Dr. Reid, pp. 26-27).

As reflected in the above referenced testimony, Dr. Reid is not being paid as an expert.   He was unsure what opinions he was going to express at the deposition.  He was never listed or disclosed as an expert by Plaintiffs.  Accordingly, he should be precluded from giving any expert opinions pertaining to causation and standard of care.

## B. DR. REID'S OPINIONS

Assuming arguendo this Honorable Court considers Dr. Reid's opinions regarding causation, these opinions are not relevant or reliable but instead are based solely on unsupported speculation. Mr. Zimmer began experiencing left side paralysis on May 30th at 6:30 p.m.   (Depo of Dr. Reid, pp. 73 - 74).  Dr. Reid admitted that he is not able to say within a reasonable degree of medical probability that Mr. Zimmer's condition today would have been different if he had been transferred shortly after 6:30 p.m. on May 30, 2001.  (Depo of Dr. Reid, pp. 83 - 84).

Dr. Baker evaluated Mr. Zimmer on May 31, 2001 at 6:45 a.m.  Dr. Reid was asked if he could tell within a reasonable degree of medical probability whether if in fact Dr. Baker had transferred Mr. Zimmer to the hospital immediately on May 31st that in fact Mr. Zimmer's condition would be any different. (Depo of Dr. Reid, p. 83).  Dr. Reid stated in response to the question "No, I can't say that". (Depo of Dr. Reid, p. 83).

The only testimony of Dr. Reid that potentially could be construed as a causation opinion is as follows:

Q:      All right.  When then would it have made any difference in your opinion based upon a reasonable degree of medical probability if he would have been shipped to the hospital.

A:      Probably when he first had the notice of slurred speech.

Q:      And that was when? May 29th 01 at 2000?

A:      At 8:30 a.m. May 29th.

Q:      8:30 a.m.  It is your opinion if he had been transferred at that time based upon a reasonable degree of medical probability you feel as though his condition today would be different?

A:      Yes. (Depo of Dr. Reid, p. 98)

                                                        . . . . . .

Q:      So that's your jumping off point there, that 8:30 timeframe.

A:      Yes.

Q:      And the key to that was the -- what was the key to that that triggered in your mind that he should have been sent out for evaluation?

A:      The slurred speech.

Q:      Anything else?

A:      That was the first thing.  Yes, that's the primary thing.

Q:      All right.  If you would have seen him in the context of the jail, knowing the history that this patient had of alcoholism, of being Marchman Act of consumption of at least a bottle of vodka a day, that this is not his first Marchman Act experience, that he had numerous situations that he had all of the medical problems we've talked about, the hepatitis, the bleeding disorder, all of the things that we talked about, and you saw him at that time, what would you have done?

A:      Gosh, that's tough.  I don't practice jailhouse medicine.

Q:      I understand that.  Would it have been unreasonable to follow him closely and observe him from that point?

A:      No.  I think it would have been reasonable to follow him closely but at the first sign of any additional progression he would need to have been transferred immediately for imaging studies, for further analysis, at least a neurological consult.  (Emphasis added)(Depo of Dr. Reid, pp. 100 - 101).

Clearly, Dr. Reid's testimony regarding Plaintiff's slurring at 8:30 a.m. on May 29th is convenient in terms of hindsight.  Mr. Zimmer arrived at the jail just before midnight on May 28th, 2001.  (December 4, 2002 depo of Thomas Joseph Zimmer V, p. 66).  Dr. Reid himself admits that hindsight is 20/20 as follows:

A:      Okay. We are starting at the beginning of the Prison Heath Services, Incorporated progress notes.  It starts at 5/28/01 at 2345.

Q:      Hold on a second.  Let me get with you.  Okay, go ahead.

A:    At that point he evidently presented as quote, "highly uncooperative" unquote, "resting quietly." He was noted to have slurred speech at a time that is difficult to read because there is a hole punched out of this, but it is between 0700 and 1230.

Q:    You want to look at mine? Mine looks like 0830, because mine has a different hole. Mr. Rush: it is. It's 0830.

Q:    Right there, 0830 (indicates). Can we agree with that?

A:    We can.

Q:    That's the entry you're talking about? Slurred speech at that point.

A:    Slurred speech.

Q:    And what's the significance of that to you?

A:    <u>Well, at that point it's questionable whether that could be an effect as alcohol or whether it's the beginning of a neurologic problem.</u>

Q:    Okay. And you would agree with me that we do have the benefit of 20/20 hindsight now as we go back and look at the records, would you not?

A:    That's true. (emphasis added.)(Depo of Dr. Reid, pp. 69 - 70).

Dr. Reid admitted that it is not unusual for an intoxicated person to have slurred speech.(Depo of Dr. Reid, pp. 103 - 104).

Although Dr. Reid gave a general opinion that, if Mr. Zimmer received medical treatment from a neurosurgeon at the early onset of symptoms that would have more likely than not reduced the permanent deficits he is left with, when questioned regarding the basis for his opinion it is clear that this opinion had little support. Dr. Reid relies entirely on the supposition that someone should have made a determination that slurred speech in a Marchman detainee approximately eight and one half hours after they are admitted severely intoxicated to the jail facility, is a sign of a serious neurological problem. This is not a valid, reasonable opinion, where Dr. Reid himself admitted that slurred speech is a sign of intoxication.

Based on the foregoing, PHS has moved this Honorable Court to exclude any and all expert opinion of Dr. Reid pertaining to causation.

## VI. PARTIAL SUMMARY JUDGMENT REGARDING CAUSE OF INTERCEREBRAL BLEED

### BACKGROUND

Assuming arguendo this Honorable Court denies PHS' Motion for Final Summary Judgment with regard to causation, PHS requests a partial summary judgment with regard to the cause of Plaintiff's intercerebral bleed.   There are no witnesses, expert or fact, who are able to state what caused Plaintiff's intercerebral bleed.  Plaintiff's own expert, Dr. Newman believes the cause of the bleed was either a result of trauma,  or because of Plaintiff's blood platelet problem which he admitted could have caused a spontaneous bleed.  (Depo of Dr. Newman, pp. 28-29)

Mr. Zimmer advised Dr. Reid, his treating physician, that he hit the back of his head in the shower.  (Depo of Dr. Reid, p. 35).  Dr. Reid believes Mr. Zimmer probably struck his head, and that caused a post traumatic intercerebral hemorrhage. (Depo of Dr. Reid, p. 36).   However, Dr. Reid's only basis for that opinion was the fact that Mr. Zimmer told him he had hit his head.  (Depo of Dr. Reid, p. 36).  Dr. Reid also noted that with Mr. Zimmer's type of bleeding disorder, particularly with his history of alcoholism, it is possible to have spontaneous bleeds.  (Depo of Dr. Reid, p. 38).  This type of hemorrhage can also be associated with hypertension.  (Depo of Dr. Reid, p. 38).

Defendant's expert neurosurgeon, Dr. Flynn acknowledged that Mr. Zimmer suffered an intercranial hemorrhage, however he was unable to say what caused the hemorrhage. (Depo of Dr. Flynn, pp. 12 - 13).   He believes the hemorrhage was either traumatic or spontaneous.  (Depo of Dr. Flynn, p. 13).  Mr. Zimmer himself testified that he hit his head while the correction officers or jailers were giving him a shower.  (Depo

of Mr. Zimmer, pp. 60 - 62).[3]  He stated, "…and then as we got at a corner, I don't know if it was in the shower or right there, but anyway they hit something with this wheel and my head went shooting right for it into the wall". (Depo of Mr. Zimmer, pp. 60 - 61).

It is anticipated that Plaintiffs' counsel will argue that Mr. Zimmer fell off a bunk while in the infirmary, thereby causing the intercerebral bleed.  It is clear from a review of the experts' testimony, however, that no one is able to say what caused the bleed. Accordingly, insinuations and references that it was caused as a result of the bunk incident are extremely prejudicial to PHS, thus,  should not be admitted.

Based on the foregoing, Defendant PRISON HEALTH SERVICES respectfully moves this Honorable Court for entry of a final summary judgment on causation, or a partial summary judgment with regard to the issue of the cause of Plaintiff's intercerebral bleed.  Defendant further requests that no evidence be admitted wherein it is indicated that any actions or inactions of representatives of PRISON HEALTH SERVICES caused the bleed.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided by electronic noticing through CM/CEF on August 9, 2004 to Robert A. Rush, Esquire, 726 Northeast First Street, Gainesville, FL 32601.

DEAN, RINGERS, MORGAN & LAWTON, P.A.

  __/s/ William E. Lawton_____
WILLIAM E. LAWTON, ESQUIRE
Florida Bar No.: 163236
Post Office Box 2928
Orlando, Florida 32802
Telephone: (407)  422-4310
Facsimile:  (407)  648-0233
Counsel for Defendant

---

[3] PHS is not responsible for the actions of the jailers or corrections officers.