UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

THOMAS JOSEPH ZIMMER, V
and THOMAS JOSEPH ZIMMER, VI,
a minor by and through his mother and
next best friend, VALREE L. CONNELL,

CASE NO.: 1:04CV29SPM

Lower Case No: 01-02-CA-2659

     Plaintiffs,

vs.

PRISON HEALTH SERVICES, INC.,

     Defendants.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PUNITIVE DAMAGES**

     The Plaintiffs, by and through their undersigned attorney, request this Court deny the Defendant's Motion for Summary Judgment on Punitive Damages ("Defendant's Motion") and in support state:

**I.     Standard of Review**

     1.  The proper way to challenge the propriety of a punitive damages claim is "by way of motion to dismiss or motion to strike, not by way of summary judgment." *Porter v. Ogden & Newell*, 241 F.3d 1334 (11th Cir. 2001).

     2.  Defendant's Motion essentially regurgitates, for the third time, the same arguments contained in its Memorandum in Opposition to Motion for Leave to Amend (Dkt. 42) which it

1

repeated in its Motion to Dismiss/Strike Plaintiffs' Claim for Punitive Damages (Motion to Strike) (Dkt. 62), nearly verbatim, both of which have been denied by this Court.  (Dkt. 124).

3.  Accordingly, this Court should summarily deny Defendant's Motion as it has already addressed the issue of Plaintiffs' claim for punitive damages when it denied Defendant's Motion to Strike (Dkt. 124).

4.  If this Court does wish to review Defendant's Motion, the proper standard of review is that of reviewing a motion to dismiss.  Upon consideration of a motion to dismiss, the court must accept the facts as alleged by the non-moving party as true and "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229 (1984); Wright v. Newsome, 795 F.2d 964, 967 (11th Cir. 1986)(finding that the court must give the non-moving "all legitimate inferences from the complaint"); Ancata v. Prison Health Services, Inc., 769 F.2d 700 (11th Cir. 1985)(recognizing that "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is . . . 'excessively low'").

5.  Defendant's Motion also fails in applying the standards for a motion for summary judgment.  As more specifically set forth below, there are genuine issues of material facts which preclude granting partial summary judgment as a matter of law.  Furthermore, most of the facts which Defendant contends are undisputed are indeed being misconstrued and misinterpreted by the Defendant.

6.  Therefore, whether this Court utilizes the standard of review for a motion to dismiss or

2

summary judgment, Defendant's Motion should be denied.

**II.    Partial summary judgment on the issue of punitive damages should be denied because there are material facts that are in dispute.**

7.  Defendant, Prison Health Services, Inc. ("PHS") has provided this Court with a statement of material facts in support of Defendant's Motion.   In compiling its statement of purported undisputed facts, PHS has ignored numerous facts which dispute its position, omit undisputed testimony that is clearly unfavorable to it,  and misrepresent the facts in evidence.  Below are a few examples of numerous factual disputes which exist and contradict those listed in PHS's statement of material facts:

**PHS's Material Fact #1 - Dr. Newman only medical expert on causation**.

PHS is very well aware of the fact that in addition to Dr. Benjamin Newman, Dr. Steven Reid, who was Mr. Zimmer's treating physician and the person in the best position to testify about his physical condition, has provided expert opinions on the issue of causation.  Dr. Reid was listed on the witness disclosure list.  PHS has not only been aware that Dr. Reid would be a witness for eight months, its attorney, William Lawton, took Dr. Reid's comprehensive deposition on January 16, 2004.  At this deposition Dr. Reid gave specific opinions regarding causation.  During this deposition, Mr. Lawton, specifically asked the Plaintiffs' attorney whether these causation opinions would be used at trial.  Mr. Rush unequivocally advised that these opinions would be used at trial. Mr. Lawton proceeded to ask in depth questions as to Dr. Reid's opinion on the issue of causation. Deposition of Dr. Reid, 62/18-66/11(pertinent parts of this deposition attached as "Exhibit A").

3

**PHS's Material Fact # 8 - When Dr. Baker saw Mr. Zimmer**

PHS again distorts the record.  While Dr. Baker saw Mr. Zimmer for the first time on May 31, 2001, he previously admitted Mr. Zimmer into the infirmary just before midnight on May 29, 2001.  Additionally, the records reflect that Dr. Baker was at the jail and in the infirmary on May 30, 2001; however, Dr. Baker failed to treat or obtain any information regarding Mr. Zimmer.  When Dr. Baker did finally make contact with Mr. Zimmer, it was more than 30 ½ hours after placing Mr. Zimmer under his care by admitting Mr. Zimmer into the infirmary.  Moreover, this first contact occurred more than 12 hours after it was noted by PHS employees that Mr. Zimmer had left sided paralysis.  See Plaintiff's Statement of Material Facts, referred to hereinafter by "Dkt. 104", ¶ 31, 32, 43, 44).

**PHS's Material Fact # 9: - Dr. Newman acknowledged that a neurosurgeon would be more qualified to render the above-referenced opinion.**

PHS has taken this statement out of context.  Dr. Newman's full and accurate testimony was that "certainly a neurologist or neurosurgeon would be more qualified to render that opinion, but this is well within the purview of a family doctor, who handles this all the time and sees patients who have very similar symptoms and, for whatever reasons, they don't go to the hospital, and what happens to them versus those who do recognize the symptoms and do go to the hospital and get emergent treatment, so I think, yes, absolutely a neurologist or neurosurgeon would be certainly more qualified than me, but any physician who has been in practice for a while has seen lots of this." Deposition Dr. Newman, 54/15 (pertinent parts of this deposition are attached as "Exhibit B).

4

**PHS's Material Fact #s 10 and 31 - The substance of Dr. Newman's testimony**

PHS has taken only select portions of Dr. Newman's testimony and distorted and mischaracterized it.  Dr. Newman's unequivocally stated that earlier intervention would have made a difference in Mr. Zimmer's condition:

Q: . . . are you able to state within a medical degree of probability that earlier intervention in this case – in other words, sending the patient out at 4:00 p.m. on May 29th would have made any difference in his outcome?

A: Yes, I am

Q: Okay.  Why are you able to state that?

A: Because we know that the sooner any intervention, in terms of diagnostics, his outcome has to be better.  It certainly wouldn't be worse.  It wouldn't be worse if we hustled and got him to the hospital.  So if it's not worse, it has to be better.  It would not be the same.  This is not a situation where you wait and see, without knowing what the patient has.  Dr. Newman, 96-16/97-5.

**PHS's Material Fact # 11 - Dr. Newman's qualification to provide medical opinion.**

PHS again distorts the testimony of a candid physician.  A review of his entire testimony reveals he also testified that "the delay in treatment, without a question of a doubt, in my mind, has resulted in permanent damage to this man.  If he was first evaluated for the discomfort in his arm, even if they thought it was a dislocation, they would find out that it wasn't.  But if they knew it was a bleed and they immediately evacuated the blood from his intracranial space, this man most likely

5

would have had no permanent damage at all." <u>Dr. Newman</u>, 26/5-12.

**PHS's Material Fact # 13 - Whether Mr. Zimmer's outcome would be the same.**

PHS mischaracterizes and selectively quotes Dr. Newman's testimony in a misleading manner. Dr. Newman absolutely testifies that he believes that Mr. Zimmer's condition would have improved with earlier treatment, but the patient was not sent to the hospital and was not given proper medical attention and care. <u>Newman</u>, 95/1-13.

**PHS's Material Fact #s 24, 25, 26, 27, 28, 29, 30, 31,32 - Dr. Reid and his opinions**.

PHS misstates and distorts facts and the issues that were discussed at Dr. Reid's January 16, 2004 deposition. One must review Dr. Reid's testimony as a whole, rather than taking isolated statements, as Defendant has, for his complete opinions. Plaintiffs are filing the relevant portions of the deposition, rather than the entire deposition as it is several hundred pages. If the Court wishes Plaintiffs will file this deposition in its entirety. Dr. Reid has never been retained or paid by the Plaintiffs to be a paid expert witness. He was the treating physician who performed brain surgery on Mr. Zimmer on May 31, 2001 and then performed after care and monitored the patient. At all times he has been an expert witness, who has unique education, training, skills, experience and qualifications that would enable him to aid the jury in deliberating medical issues in this case. The deposition testimony was clear and the intention of the parties to use Dr. Reid's testimony was unambiguous. Dr. Reid rendered opinions during his deposition regarding Mr. Zimmer's condition, the surgery that was performed, the damages that he suffered, and causation issues. In the middle of that deposition defense counsel, Mr. Lawton, asked plaintiff's counsel, Mr. Rush, if Plaintiffs'

6

intended to use Dr. Reid for his opinions including causation issues:

> Mr. Lawton: Do you plan on using him as an expert on those points at trial?

> Mr. Rush: I'm going to ask him all of those questions.  <u>Dr. Reid</u>, (61/21-24)**.**

Defendant's attorney then asked questions about medical records, to which Dr. Reid replied:

> A.  Okay.  And again, let me point out that I'm not here as a hired gun on anybody's side.
> You know, so far I've just been here to testify to my evaluation and treatment of this patient.
> So, you know, I'd be glad to go ahead and review these things for you if you think that's
> important.

> Q.  (By William Lawton) Well, it's important if you're going to  specifically stated:
> testify to it at trial, you bet you it is.  Because you understand I have a job to do to represent
> my client.

> A.  Sure.

> Q.  And I'm just trying to do a full deposition of you today so I'm not going to be surprised
> at the trial.  And I want to know if you're going to express opinions like that at the trial, and
> Mr. Rush indicated you are, so then I want to know the specific factual basis.  So in answer
> to your question, we're going to have to go through those.  All right. <u>Dr. Reid</u>, (65/19-
> 66/11).

Thus, PHS and its attorneys have been aware, since at least January of 2004 that Dr. Reid was a

treating physician who, through the course of his treatment, was giving opinions, for trial, on all

matters including, injuries, treatment and causation.  Dr. Reid further testified:

"It is my medical opinion that the failure to evaluate Mr. Zimmer's neurological deficits much sooner than they did, it is more likely than not that he would not have had the severity of symptoms that he suffered." Dr. Reid, 96/6-11.

"It is more likely than not that PHS' medical staffs failure to recognize Mr. Zimmer's neurological deficits and to order an evaluation– caused or contributed to the further damage that he suffered." Dr. Reid, 96/15-96/20.

"Had Mr. Zimmer been sent out immediately to the hospital for a CAT scan at the beginning of the onset of neurological symptoms, a CAT scan would have very likely documented or provided evidence of an early onset brain bleed." Dr. Reid, 96/24-97/9.

"If Mr. Zimmer had received medical treatment from a neurosurgeon at the early onset of symptoms, it would have more likely than not reduced the permanent deficits that he is faced with." Dr. Reid, 97/10-13.

"It is my assessment based on my treatment, including surgery, as well as the available data that I reviewed that this was an expanding blood clot with progressive neurological deficits, and the sooner that he was treated, the quicker the deficits would be minimized." Dr. Reid, 97/10-98/1.

"It is my opinion based in a reasonable degree of medical probability that if Mr. Zimmer had been transferred to the hospital at 8:30 a.m. on May 29, 2001, when he presented with neurological symptoms, that his condition today would be different." Dr. Reid, 98/18-21.

"The basis of this opinion is that it is likely that Mr. Zimmer had the presence of an

8

expanding blood clot at that point in time and that as it progressed and did additional brain damage, he developed his left hemiparesis.  To a reasonable degree of medical probability, intervention before that time would have probably prevented such a severe neurologic deficit."  Dr. Reid, 98/24-99/7.

"I can testify that it is indeed neurological standard of care to treat expanding intracerebral hematomas as early as possible.  It is malpractice to not treat such expanding intracerebral hematomas when they are identified."  Dr. Reid, 99/10-99/18.

PHS's rendition of Dr. Reid's testimony in its material statement of facts is misleading and is a complete mischaracterization of Dr. Reid's true testimony.

In PHS's statement of material fact #29, it alleges that "Dr. Reid acknowledged that he does not practice jail house medicine.  However, this assertion of fact is a misnomer and a mischaracterization.  A health care provider is held to the same standard of care as all other health care providers with their licensure in the community.  There is no such standard of care that is defined as "jail house medicine."

### PHS's Material Fact # 34 - Mr. Zimmer's care is within the applicable standard of care

This is again a distortion of the records.  While the PHS's paid expert testified that the care and treatment given to Mr. Zimmer by PHS staff was within the applicable standard of care, PHS's own employees contradict this statement.  Linda Owens RN, PHS's Health Service Administrator, Trish Wright RN, PHS's Director of Nursing, Barbara Homer-Pitts RN, PHS's  Regional Executive Vice President and Dr. Scott Kennedy MD, PHS's Regional Medical Director all testified, under

9

oath that the care and treatment given to Mr. Zimmer fell below the applicable standard of care. Deposition of Linda Ownens, 160/10-162/2 (pertinent parts of this deposition attached as "Exhibit C"; Deposition of Tish Wright, 58/2-74/6 and 84/4-24 (pertinent parts attached as "Exhibit D"); Deposition of Barbara Homer-Pitts, 185/14-186/6 (pertinent parts attached as "Exhibit E"); Deposition of Scott Kennedy, 88/12-89/10, 90/24-92/8, 98/5-100/25, 173/21-193/24, 235/3-237/14(pertinent parts attached as "Exhibit F").

### III.    Plaintiffs have alleged a sufficient factual basis for punitive damages.

8.  The Plaintiffs intend to prove, and have proffered evidence, that Prison Health Services, Inc. ("PHS") demonstrated a complete disregard to their statutory duty to provide detoxification service and proper medical care to Marchman Act detainees, an obligation imposed on them pursuant to Florida law, Ch. 397, demonstrated complete and deliberate indifference in their care and treatment of the Plaintiff, THOMAS JOSEPH ZIMMER, V ("Mr. Zimmer"), for whom they had a common law duty to provide reasonable care and a statutory duty to provide services under Fla. Stat. Ch. 397, and the evidence will show that PHS's conduct was promoted solely by their desire to increase their profits.

9.  The undisputed testimony is that Dr. Larry Baker was the Medical Director for PHS, that he had complete decision-making authority over the Alachua County Adult Detention Center ("ACADC") and also the St. John's County Detention Center medical units.  (Dkt. 104; ¶16, 17).

10.  The undisputed testimony shows that PHS's Medical Director, Dr. Larry Baker and its medical staff failed to send Mr. Zimmer to the hospital when it was reasonably necessary due to Mr.

10

Zimmer's medical condition, they ignored signs and symptoms of his deteriorating neurological condition, and showed a wilful, wanton and deliberate indifference to Mr. Zimmer's medical needs. The evidence establishes that the reason for the delay in treatment was to save PHS outside emergency hospitalization costs associated with transferring Mr. Zimmer to the hospital while he was still considered a patient of PHS under their contract with the Alachua County Sheriff. (Dkt. 104; ¶ 8,51,52,53).

11.  The undisputed testimony shows that PHS delivers medical services to jails and prisons, and does so for profit.  Their annual statement shows that the contingent costs which would affect their profitability are medical claims and other charges incurred when outpatient services and hospitalization services are required to be utilized.   See PHS's Annual Statement, (pertinent parts attached as "Exhibit G").

12. PHS's contract with the Alachua County Sheriff requires PHS to pay the first $15,000.00 in outside hospitalization and medical costs rendered when an incarcerated person is transferred to an outside hospital.  (Dkt. 104; ¶8).

13.  Hugo Rodriguez, who is the Sheriff's designated employee in charge of contract compliance, testified under oath that PHS was responsible to pay for the first $15,000.00 of medical care for any individuals, such as Tommy Zimmer, who were sent out for hospital care while under the Marchman Act.  (Dkt. 104; ¶8).

14.  While PHS attempts to argue that it would not have been financially responsible for Mr. Zimmer if he was sent out to the hospital prior to the expiration of his Marchman Act Commitment

11

time, Linda Owens, the Health Service Administrator in charge of compliance of the Health Service contract with the Alachua County Sheriff and a managing agent for PHS, testified under oath that PHS would have been responsible for Mr. Zimmer's medical costs if he was transferred to the hospital prior to the expiration of his Marchman Act Commitment time.  Linda Owens, 157/13-158/8; Deposition of Hugo Rodriguez, 7/4-12/24 (pertinent parts of this deposition are attached as "Exhibit H").

15.   The facts show that an involuntarily committed Marchman Act detainee, like Mr. Zimmer, is a person covered by PHS's contract with Alachua County.  If Mr. Zimmer was sent out to the hospital while still an incarcerated person, PHS would be required to pay the first $15,000.00 in medical costs. Linda Owens, 157/13-158/8; Hugo Rodriguez, 7/4-12/24.

16.  If Mr. Zimmer was released from custody prior to being sent to the hospital, PHS would not be obligated to pay for his hospitalization.  Hugo Rodriguez, 7/4-12/24.

17.  Dr. Larry Baker specifically stated that he would "wait until the Marchman Act expires" before transporting Mr. Zimmer to the hospital for emergency treatment.   Dr. Baker admitted that there was no medical reason not to send Mr. Zimmer immediately to the hospital.  (Dkt. 104, ¶ 52) and Deposition of Dr. Larry Baker, 70/8-22 (pertinent parts attached as "Exhibit I").

18.  A jury could reasonably conclude from this evidence that the sole reason that Dr. Baker waited to have Mr. Zimmer transported to the hospital was so that he would no longer be part of the incarcerated population, and therefore PHS would not be responsible for the outpatient medical services and hospitalization costs.

19.  In addition, the undisputed record shows that Dr. Baker and all the PHS medical staff ignored Mr. Zimmer during his stay in the infirmary, despite dramatic deterioration in his physical condition from when he was first brought in.  He had continuing neurological deficits, hour by hour and day by day until he was ultimately paralyzed on his left side.  (Dkt. 104, see progress notes filed with Plaintiffs' Statement of Material facts filed therein as "Exhibit 17").

20.  Despite the fact that Dr. Baker, in a telephone consult, specifically referred Mr. Zimmer to the infirmary on May 29, Dr. Baker did not see Mr. Zimmer at all on May 30.  On May 31 when Dr. Baker finally saw Mr. Zimmer, Dr. Baker performed only a cursory examination from the doorway, despite the fact that Mr. Zimmer was strapped into a chair to hold him up, had his head propped up against the wall in order to hold his head upright, his left arm was curled up motionless in his lap, and his left leg hung limp.  (Dkt. 104; ¶ 49 and progress notes filed with Plaintiffs' Statement of Material facts filed therein as "Exhibit 17").

21.  Rather than this being an isolated incident, the evidence shows that it was the normal custom and practice of PHS to ignore Marchman Act detainees and to fail to follow the statutory guidelines regarding detoxification services as set forth in Fla. Stat. Ch. 397.  In fact, PHS's employees were unaware of their own protocols and procedures designed specifically for the care and treatment of Marchman Act detainees.  (Dkt. 104; ¶14,15).

22.  The record evidence shows that Dr. Baker admitted, under oath, that he did not understand his obligations or duties under the Marchman Act including, the time constraints under the Statute.  He never hears about Marchmans being in jail despite the contradictory requirements

13

in the statute.  Dr. Baker said he was unaware of and did not follow-up with regards to records coming in for Marchman Acts.  He was unaware of policies and procedures in regards to the requirement to establish independent treatment plans.  He was unaware of his duties under the statute, PHS's policies and procedures for Marchman Act commitments.  PHS failed to provide him any training regarding the legal requirements or medical evaluation or standard of care requirements when a person is brought into the jail under the Marchman Act. (Dkt.104, ¶15).

23.  The record evidence established through the sworn testimony of Dr. Scott Kennedy, the Regional Medical Director for PHS and Dr. Baker's direct supervisor, that he had  never read the Marchman Act statute, nor did he understand or have a working knowledge of what it requires.  Dr. Kennedy never required Dr. Baker, or any of his staff, to read the Marchman Act or to know what the statute requires.  (Dkt. 104,¶15).

24.  Dr. Kennedy admitted that he had no understanding or idea how a Marchman Act commitment has to be released or the statutory requirements for facilitating proper and adequate medical care.  Additionally, Dr. Kennedy had no understanding or knowledge as to the time constraints and periods mandated by the Marchman Act.  (Dkt. 104, ¶15).

25.  The record evidence also establishes through the sworn testimony of Tish Wright that at no time as the director of nursing did PHS ever go over the Marchman Act statute with her.  Furthermore, she was never explained the rights and the laws that apply to Marchman Act commitments.  Tish Wright also admitted that she had no awareness as to the requirements under the Marchman Act statute as to the requirement that an evaluation by a qualified professional by

14

performed or that the physician, who placed Mr. Zimmer into protective custody, had to be notified of Mr. Zimmer's release under the act. (Dkt. 104, ¶15).

26. The facts are undisputed that PHS's contract with the Alachua County Sheriff required it to provide detoxification services pursuant to Fla. Stat. §397 for Marchman Act patients.

27. From the evidence a reasonable jury could easily conclude that PHS attempted to cover up their gross malfeasance by having each and every corporate official intentionally misrepresent PHS's responsibility toward providing care for a Marchman Act commitment. Dr. Larry Baker stated that he "never sees Marchman Act detainees". Then both the Regional Medical Director, Dr. Kennedy, and the Corporate Representative, Barbara Homer-Pitts, testified under oath that PHS doesn't deal with Marchman Act commitments. (Dkt. 104, ¶15); Dr. Kennedy, 43/4-44/25 ; Barbara Homer-Pitts, 24/21-27/23.

28. In the alternative, a reasonable jury could also conclude that PHS, its employees, directors, managers, and managing agents were so ignorant of PHS's contractual and statutory responsibilities that it amounted to a total want of care for all Marchman Act detainees, specifically Mr. Zimmer.

29. In addition, this record establishes that there was complete malfeasance on the part of the PHS nursing staff in their care of Mr. Zimmer, including failing to adequately, timely and properly perform an initial intake screening. They failed to immediately send Mr. Zimmer to the infirmary for detoxification services as required under their own policies and as recommended by the physician who Marchman Acted Mr. Zimmer and sent him to the jail. The staff breached its

15

standard by failing to implement a proper detoxification program, failed to properly observe, assess and treat Mr. Zimmer.  The staff breached standard of care by failing to contact the medical director when Mr. Zimmer condition mandated they do so.  The staff failed to implement necessary and required fall precautions and then failed to notify the doctor when Mr. Zimmer was found on the floor and found to have suffered a change in his neurological condition.  Furthermore, there was a breach in the standard of care for allowing a 12 ½ hour time frame in which there was no medical progress notes or documentation of any kind that speaks to Mr. Zimmer's physical assessment.  After 12 ½ hours of no care, it was documented that Mr. Zimmer presented with left sided paralysis; however, no doctor was notified.  The nurses failed to act with the necessary professional autonomy and the responsibility to intervene for the protection and welfare of the patient.  Specifically, when the doctor ordered Mr. Zimmer to stay there until Marchman Act expires, there is no documentation of any nurses doing any intervention on behalf of Mr. Zimmer for the protection of the patient.  The records clearly show a progressive deterioration of Mr. Zimmer without any proper medical intervention.   There is no documentation of any form of treatment or notation of Mr. Zimmer's physical condition.  The failure of PHS's medical staff to note and adequately chart Mr. Zimmer's medical condition compromised the health, safety, and welfare of Mr. Zimmer.  (See Plaintiffs' Statement of Material Facts, Dkt. #104).

    30.  Dr. Thompson, the Medical Director for Meridian Health Care, which is a detoxification facility with the same statutory responsibilities under Fla. Stat. Ch. 397 as the infirmary run by PHS, has described under oath that the entire treatment of Mr. Zimmer shows a want of care and a willful

indifference to a serious medical situation.  Deposition of Dr. Thompson, 50/1-61/2 (pertinent parts attached as "Exhibit I).

31.  Dr. Benjamin Newman, an expert witness and a physician who was in charge and oversaw the medical care for jail inmates in Seminole County, Florida for over twenty five years, has testified that there was either a complete lack of medical standard of care or in the alternative, there was willful neglect on the doctor's and nurses' part. The neglect appears to be willful.  He further opines that the lack of care provided to Mr. Zimmer is inexcusable and that while Mr. Zimmer was in Prison Health Services' care, there was an indifference to his welfare by the medical department.  Dr. Newman, 10/5-12/9 and 23/24-26/24.

32.  Linda McKnew, who is a nurse expert, opined that the care or lack thereof from the nursing staff was so egregious that it should have been reported to the state licensing board.  It was her testimony that there was nearly no standard of care rendered at all.  Deposition of Linda McKnew, 82/13-25 (pertinent parts attached as "Exhibit K").

33. Linda Owens, RN, Health Services Administrator and managing agent for PHS, testified under oath that based on all of the records and the facts reviewed in this case, that PHS demonstrated a complete lack of care for Tommy Zimmer and that based on everything one could call the conduct of PHS's nursing staff outrageous.  Linda Owens, 160/10-162/2.

34.  Dr. Scott Kennedy, Regional Medical Director for PHS, and Barbara Homer-Pitts RN, and Regional Vice President for PHS, both testified in their depositions that PHS medical staff, on numerous occasions when treating Mr. Zimmer, breached its standard of care, and described their

17

companies failures as dereliction of their duties.  <u>Dr. Kennedy</u>, 173/21-193/24.

## IV.   Memorandum of Law

35.   Delay in medical treatment for non-medical reasons constitute deliberate indifference. <u>See</u> <u>Ancata</u>, 769 F.2d at 700.  It follows that such deliberate indifference can form the basis for a punitive damages claim.  When determining whether to allow a claim for punitive damages, the trial court first must "'decide whether there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff'".  <u>Id.</u> (quoting <u>Wackenhut Corp. v. Canty</u>, 359 So. 2d 430 (Fla. 1978).  Once this determination is made, "the decision whether to award punitive damages and the amount that should be awarded have traditionally been questions for the jury to determine."  <u>Id.</u>

36.   Punitive damages are used to punish a defendant for its wrongdoing and to deter similar conduct in the future.  <u>See</u>  <u>Owen-Corning Fiberglass Corporation v. Ballard</u>, 749 So. 2d 483, 486 (Fla. 1999).  A plaintiff can justify the imposition of punitive damages by showing conduct that amounts to something more than gross negligence.  <u>White Construction Co., Inc. v. Dupont</u>, 455 So. 1026 (Fla. 1984), receded from on other ground, <u>Murphy v. International Robotic Systems Inc.</u>, 766 So. 2d 1010 (Fla 2000).

37.   In <u>White Construction</u>, the Court reaffirmed the standard to use when assessing a claim for punitive damages:  "The character of negligence necessary to sustain an award of punitive damages must be of 'gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which

18

would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them." Id. at 1029 (quoting Carraway v. Revell, 116 So. 2d 16 (Fla. 1959).

38.  There are several scenarios which justify an award of punitive damages.  First, punitive damages may be assessed against corporate medical care providers, such as PHS, that display an entire want of care which would raise the presumption of a conscious indifference to consequences or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.  Second, punitive damages may arise from situations in which a corporation, such as PHS, has made a calculated business decision to ignore safety concerns and instead maximize profits.  Finally, under either senario it is clear that a corporation can become liable for an award of punitive damages.

### A.      Actions and Omissions of Corporate Health Care Providers

39.  There is no doubt that PHS can be held liable for its actions that surpass mere negligence and instead constitute acts of deliberate indifference.  Ancata v. Prison Health Services, Inc., 769 F.2d 700 (11th Cir. 1985).  In Ancata, the court reversed the lower courts's dismissal of the plaintiffs' 42 U.S.C. § 1983 claim.  The court found that there was a sufficient basis for finding that there was deliberate indifference on the defendant's part.  Id. at 704.  In Ancata, Prison Health Services was one of the defendants, Prison Health Services was alleged to have withheld medical services for non-medical reasons, and Prison Health Services was alleged to have placed its own financial interests

ahead of the plaintiff's serious medical needs.  Id.  These are essentially the same allegations made in the instant case.  In Ancata, these allegations satisfied a deliberate indifference standard.  In the instant case, these allegations, likewise, satisfy a punitive damages standard.

40.   Additionally, the acts or omissions of a health care provider can warrant the imposition of punitive damages.  See Beverly Enterprise-Florida, Inc. v. Spilman, 661 So. 2d 867 (Fla. 5th DCA 1995).  In Spilman, the plaintiff was subjected to a variety of abuses while at the defendant's living facility.  At trial, the defendant moved for a directed verdict on the issue of punitive damages and claimed that the evidence "was insufficient to demonstrate that its agents acted in a manner that was malicious or in willful disregard of the rights of others."  Id. at 870.  The trial court denied this motion and the defendant appealed.

41.   On appeal, the court recognized that the Florida Supreme Court had articulated a punitive damages standard, which included conduct that showed "'that entire want of care which would raise the presumption of a conscious indifference to consequences . . . or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.'"  Id. (quoting White Construction Co., Inc. v. Dupont, 455 So. 2d at 1029).  The court noted that the role of the trial court "is to decide at the close of the evidence whether there is a legal basis for recovery of punitive damages shown by **any interpretation** of the evidence favorable to the plaintiff."  Id. at 873 (emphasis added).

42.   The Spilman court determined that there was a legal basis to send the question of punitive damages to the jury.  The court highlighted the specialized care required by residents who

lived in the nursing facility.  The court noted that these residents "are completely dependent upon the employees of the nursing home, who are supposed to be guided and directed by the nursing home's supervisors."  Id.  The defendant had argued that it was not responsible for the plaintiff's "deplorable treatment" because its managers had no knowledge of the abuse.  The court rejected this argument and stated that the defendant "cannot escape responsibility by managing its facility with managers who close their eyes, refuse to hear, and dull their sense of smell."  The court determined that the defendant either "failed to take any action to assist this totally dependant human being or so totally ignored the operation of the nursing facility that Walter Spilman's plight went unnoticed." Id.  In either case, the court felt this conduct was sufficient to sustain a punitive damages award.  Id. at 874-875; See also Bemenkamp v. Beverly Enterprises-Kansas, Inc., 762 F. Supp. 884, 894 (D.Kan.1991)(finding that plaintiff, who had sustained injuries that went untreated at living facility, was entitled to seek punitive damages where plaintiff claimed that defendant was "reckless in employing an inadequate number of employees to properly care for patients"and defendant's employees admitted that facility was understaffed and the employees were overworked); Hoffman v. Memorial Ostepathic Hospital, 342 Pa.Super. 375, 492 A.2d 1382 (Pa. 1985)(recognizing that defendant-physician's conduct was sufficient to submit a claim for punitive damages to jury when defendant-physician had allowed plaintiff to remain on hospital floor for two hours, ignored signs of neurological paralysis, ignored the plaintiff's cries for help, and informed staff not to assist the plaintiff); Rennewanz v. Dean, 114 Org. 259 (Or. 1924)(finding that trial court properly submitted the issue of punitive damages to a jury where defendant-physician knew that plaintiff was

21

hemorrhaging yet left plaintiff "unattended, uncared for, and abandoned continuously for a period of 48 hours").

### B.    Deliberate business decisions that ignore safety concerns and maximize profits

43.   PHS's decision to ignore substantial dangers to its patients and thereby  maximize its profits warrants the imposition of punitive damages.  See American Motors Corporation v. Ellis, 403 So. 2d 459 (Fla. 5th DCA 1981).  In American Motors, there was evidence that the defendant "was aware of the catastrophic results of fuel tanks fires in its vehicles."  Id. at 467.  Additionally there was evidence from which a jury could have determined that the defendant wanted to maximize profits and therefore chose not to implement safety regulations.  Despite this evidence at trial, the court granted a directed verdict for the defendant on the issue of punitive damages.

44.   On appeal, the court recognized that the purpose of punitive damages is "to punish the wrongdoer and to deter him and others from such wrongdoing in the future."  The court noted that "the wrongful act must be characterized by some circumstance of aggravation, such as willfulness, recklessness, maliciousness, outrageous conduct, oppression, or fraud."  The court determined that there was a reasonable inference from the plaintiff's evidence that the defendant was aware that its fuel tank was defective and dangerous but chose not to seek safer alternatives.  Accordingly, the court determined that there should be a new trial on the issues of punitive damages.  Id.; See also Piper Aircraft Corporation v. Coulter, 426 So. 2d 1108 (Fla. 4th DCA 1983)(holding that the defendant's "failure to act in the face of a known, substantial danger to the lives of the aircraft occupants could constitute a sufficient basis for an award of punitive damages" where defendant had

22

prior knowledge that its aircraft had a dangerous condition and took no action to remedy or warn); O'Gilvie v. International Playtex, Inc., 821 F.2d 1438 (10th Cir. 1987)(finding that evidence was sufficient to create a jury question on the issue of punitive damages where defendant was aware that product was unsafe, was aware that its competitors were removing similar product from the market place, yet deliberately sought to financially profit from the situation by advertising the effectiveness of its product that it knew was unsafe).

**C.    Corporate Liability for Punitive Damages**

45.   It is well established law that a corporation may be responsible for punitive or exemplary damages to the same extent as a natural person.  Winn v. Lovett Grocery Co. v. Archer, 126 Fla. 308, 323 (Fla. 1936).  More recent decisions have explained that there are two separate theories by which a corporation may be held liable for punitive damages.  Schropp v. Crown Eurocars, Inc., 654 So. 2d 1158, 1161 (Fla. 1995).

46.   Under the first theory, a corporation will be responsible if a plaintiff can prove actions of a corporate employee that would sustain a punitive damages award, coupled with some negligence on the part of the corporation itself.  Under the second theory, a corporation will be responsible for the imposition of punitive damages, if the plaintiff can simply show that one of the corporation's managing-agents has engaged in conduct that would sustain such a punitive damages award.  PHS's liability for punitive damages can be proved under either analysis.

**(1)    Some Evidence of Independent Corporate Fault**

47.   Under the first theory, a corporation may be liable for punitive damages if it can be

23

established that the conduct of an employee was willful and wanton and there is some evidence of independent fault on the part of the corporate employer amounting to at least ordinary negligence. Mercury Motors Express, Inc. v. Smith, 393 So. 2d 545, 549 (Fla. 1981)(holding that while the conduct of the employee must be found to have been willful and wanton the plaintiff must only "allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages"). Pursuant to this theory of corporate liability, "it is not necessary for the plaintiff to establish that the corporate employer acted with the same heightened culpability as the employee to allow punitive damages." Shropp v. Crown Eurocars, Inc., 654 So. 2d 1158, 1160 (Fla. 1995).

48.  Florida Statute § 768.72(3)(b) provides that a corporation can be liable for punitive damages if the conduct of the employee meets the criteria of necessary to sustain punitive damages and "the officers, directors, or managers of the . . . corporation, or other legal entity knowingly condoned, ratified, or consented to such conduct". In the instant case, it has been alleged that the nurses acted with gross negligence and reckless disregard as to the care and treatment of Plaintiff Thomas Zimmer.   PHS's medical director, Larry Baker, knowingly condoned, ratified and consented to this conduct.  Clearly, Dr. Baker is a director and manager as contemplated by the statute and as such, PHS would become liable for any award of punitive damages.

49.  In addition the ongoing discovery continues to show how managers, directors, and/or officers of PHS have continued to condone, ratify, and/or consent to this grossly negligent behavior. The depositions of corporate representatives revealed that no investigation was undertaken and no

24

remedial action taken after it was discovered that Mr. Zimmer received this type of treatment. These corporate representatives, who are both clearly directors and officers for PHS, ratified, consented, and condoned the treatment that Mr. Zimmer received from both the nurses, as well as Dr. Baker. Perhaps even more appalling, these corporate representatives attempted to claim that PHS did not have any responsibility for Marchman Act detainees like Mr. Zimmer, even though there was a contract which they had been profiting from that clearly showed otherwise.

(2)   <u>Liable for the actions of a managing agent or employee holding policy making position.</u>

50.   Under the second theory of corporate liability, a corporation can become liable for damages as a result of the actions of a managing agent or an employee holding a policy making position. See <u>Id.</u> at 1161; <u>Winn-Dixie Stores, Inc. v. Robinson</u>, 472 So. 2d 722 (Fla. 1985); <u>Bankers Multiple Line Insurance Co. v. Farish</u>, 464 So. 2d 530, 533 (Fla. 1985)(holding that the <u>Mercury Motors</u> "decision was not intended to apply to situations where the agent primarily causing the imposition of punitive damages was the managing agent"). In order to sustain a punitive damages verdict against a corporation under this second theory, the Plaintiff must establish that the person responsible for the imposition of punitive damages was a managing agent or held a policy making position. See <u>Schropp</u>, 654 So. 2d at 1161 (recognizing that the Court had previously held that the acts of a grocery store manager would be considered the acts of a managing-agent and would provide the jury with sufficient evidence of misconduct sufficient for direct corporate liability of punitive damages). In the instant case Dr. Larry Baker was the medical director and clearly is a

25

managing-agent or an employee holding a policy making position. Dr. Baker has given sworn testimony stating that "my title is Medical Director and I oversee the medical aspects of the Alachua County Jail Facility, clinic and infirmary. I oversee the clinical aspect of everything that happens in the clinic and the infirmary. . . . I make decisions on whether a patient is necessary to be transported out for any other care, other than what we can afford – not afford, but I mean, medically afford to do in the jail." Dr. Baker, 10/14-24. Based on Dr. Baker's position in the corporation, PHS would be directly liable for the punitive damages imposed as a result of Dr. Baker's willful and wanton actions.

## V.   CONCLUSION

51. Plaintiffs have sufficiently plead a set a facts to justify an award of punitive damages and have previously proffered evidence that would allow for such a finding. If there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff, it should be left to the jury to decide whether to award punitive damages.

52. A motion to dismiss/strike is the proper method of considering punitive damage issues. The Court has already denied PHS's Motion to Dismiss/Strike Punitive Damages. Through this motion for partial summary judgment, PHS is simply rehashing the same arguments that have already been made to the Court.

53. The willful and wanton misconduct of PHS's employees coupled with the negligence of PHS's managers, directors, and/or officers will allow for corporate liability of punitive damages under the Mercury Motors analysis. The willful and wanton misconduct of Dr. Baker, as a

managing agent of PHS, will allow for direct corporate liability of punitive damages.  Moreover, the failure of Dr. Kennedy, as Regional Medical Director and Barbara Homer-Pitts, as the Corporate Representative, to acknowledge that PHS was responsible for Marchman Act commitments, such as Mr. Zimmer, and their failure to take any corrective action to prevent this type of treatment will also allow for direct corporate liability.

WHEREFORE, Plaintiffs hereby request that this Honorable Court deny the Defendant Prison Health Services, Inc.'s Motion for Summary Judgment on Punitive Damages and allow the issue of punitive damages to be decided by a jury.

RUSH & GLASSMAN

  S/Robert A. Rush
Robert A. Rush, Esq.
Florida Bar No 0559512
726 N.E. First Street
Gainesville, FL 32601
(352) 373-7566     (352) 376-7760 fax
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiffs' Memorandum In Opposition to Defendants' Motion for Summary Judgment on Punitive

Damages has been furnished, by electronic mail via ECF/CM, to William E. Lawton, Esq., P. O. Box 2928, Orlando, FL 32802 this 27th day of August, 2004.

   S/Robert A. Rush
Robert A. Rush

28